Filed 6/8/22  In re C.F. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re C.F. et al., Persons Coming Under the Juvenile Court Law. | C094854 |
| YOLO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>T.C.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. JV20193811, JV20193812, JV20193813, JV20193814) |

T.C., mother of the minors (mother), appeals from the juvenile court's order terminating her parental rights and freeing the minors for adoption.  (Welf. & Inst. Code, §§ 366.26, 396.)[1]  She challenges the court's finding of adoptability and its finding that

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

the beneficial parental relationship exception did not apply. Finding no merit in mother's claims, we affirm the juvenile court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

Four minors are the subject of mother's appeal: C.F. (six years old), V.F. (four years old), H.R. (one year old), and P.C. (two months old). A.F. is the father of C.F. and V.F. J.C. is the father of P.C. The identity of H.R.'s father is unknown.

The minors came to the attention of the Yolo County Health and Human Services Agency (Agency) when, in November 2019, J.C. pushed and strangled mother while she was holding the infant P.C., and in the presence of one-year-old H.R. When mother attempted to call the police, J.C. prevented her from doing so. J.C. was eventually arrested, but mother was reluctant to end her relationship with him. She did agree to a safety plan whereby, in order for the minors to remain in her care, she would enroll in domestic violence education and individual counseling, seek a permanent restraining order against J.C., and file for full custody of the minors.

Initially, mother appeared to be adhering to the safety plan. However, on December 12, 2019, it was discovered that mother had been hiding J.C. in her home in direct violation of the restraining order. The minors were removed from mother and placed in two separate foster homes, with the two eldest minors in one foster home and the two youngest minors in another. On December 16, 2019, the Agency filed petitions pursuant to section 300, subdivision (b), alleging the minors were at substantial risk of serious physical harm due to the domestic violence between mother and J.C.

### *Jurisdiction and Disposition Hearings*

At the jurisdiction hearing held on January 7, 2020, the juvenile court sustained the allegations in the petitions, adjudged the minors dependents of the juvenile court, and ordered a counseling referral for C.F. The disposition hearing was set for January 28, 2020.

The Agency filed its disposition report on January 24, 2020. The Agency recommended reunification services for mother and the two known fathers, J.C. and A.F. The report documented mother's extensive child welfare history, including at least 15 prior referrals between 2010 through 2019, several of which involved domestic violence. Mother struggled with understanding the impact of domestic violence on herself and the minors and had been unable to keep the minors safe from violence. She remained in contact with J.C., arriving with him for visitation with the minors. She needed intensive services to address issues regarding the cycle of family violence and being a victim of domestic violence, as well as parenting classes to increase her parenting skills and her understanding of the minors' physical, emotional, and developmental needs. Mother reportedly suffered from a history of depression and had sought mental health services.

The disposition report noted that mother informed the Agency that while she had continued contact with J.C., he had neither returned to, nor was he living in, the home with her. She reported that J.C. was trying to abide by the restraining order, but it was she who was pressuring him to "return to the home and be a family." Mother claimed the domestic violence incident with J.C. was a one-time event and occurred due to the stress and pressures she and J.C. faced, including the death of her father and the birth of her daughter. She also reported a history of domestic violence with A.F.

The report further noted developmental and behavioral issues with H.R. and C.F. H.R. struggled with speech and communication. It was reported that she often made garbling noises when she attempted to speak. The Agency recommended a referral for an Alta Regional Center speech and language assessment. C.F. reportedly had difficulty with anger and often hit his younger sibling, V.F. He also threw temper tantrums when his requests were denied, and he struggled with being truthful. He appeared to be fearful of consequences when he got in trouble at his foster home, and he informed the social worker that J.C. "whooped" and slapped him when he got in trouble. Both he and H.R.

3

told the social worker about fighting in the home, being hit, being spanked on the bottom, and being slapped in the face by J.C. when mother was at the store.

The Agency did not recommend returning the minors to mother's care, as mother had not yet gained insight or the skills to keep herself and the minors safe from domestic violence. Without intensive services to address their experiences and the impact of the trauma, as well as intensive services to address mother's mental health, the minors would be at greater risk. Given the fathers' respective histories of domestic violence and anger, the Agency believed it was unsafe to return their respective children to them.

At the conclusion of the disposition hearing, the juvenile court ordered out-of-home placement. The juvenile court also ordered the Agency to provide reunification services to the parents. The court then set a six-month review hearing for July 6, 2020.

### Six-Month Review Hearing

As of the six-month review, there were no new concerns regarding the minors, who continued to live comfortably in two separate foster homes with all of their needs being met. C.F. expressed his desire to return to mother's care. The Agency's status review report noted that mother told the Agency that J.C. lived with the paternal grandmother, however J.C. reported his address to be the same as mother's. There had been one reported incident of domestic violence since the disposition hearing. On May 1, 2020, J.C. was arrested after he got into an argument with mother and threw a chair at her car. Meanwhile, the other father, A.F., had undergone a psychological evaluation after attempting suicide. He was referred to mental health treatment for medication and was refusing to communicate with the Agency.

Mother was engaged in services prior to the statewide shutdown due to the COVID-19 pandemic. She suffered from "high anxiety," but had yet to undergo a medication assessment. She showed "ambiguous" levels of insight regarding her understanding of domestic violence and was inconsistent in her attendance in parenting classes. She claimed J.C. needed to work on his anger. She was participating in two 20-

4

minute video visits (necessitated by the ongoing pandemic) per week. It was noted that mother struggled to redirect the older minors during visits but was open to suggestions and redirection from the visitation monitor. It was reported that during a visit mother had asked C.F. if he was being abused, without any context or reason, which seemed to confuse C.F. Mother also made accusations that a caregiver was yelling at the minors and calling them names.

Having continued concerns for the safety of the minors if returned to the parents' care, the Agency recommended, and the court ordered, continued out-of-home placement and continuing reunification services to the parents.

### *Twelve-Month Review Hearing*

The court held a 12-month review hearing pursuant to section 366.21, subdivision (f) on January 12, 2021. According to the Agency's report for the hearing, the parents were not adjusting well. J.C. had been arrested in July 2020 for unlawful possession of a firearm and again in October 2020 for disobeying a court order. A.F. was in custody after being arrested twice in October 2020 for false imprisonment and battery of a spouse or cohabitant and violation of parole, and once in December 2020 for threatening a crime with intent to terrorize. Mother was still in a relationship with J.C., albeit tumultuous. During an unannounced home visit in July of 2020, the parents argued in front of an Agency social worker and at another point while the parents were out of sight of the social worker, the social worker heard mother say "ow," and mother reported J.C. pushed her in the back with a book. On July 29, 2020, mother, who drove J.C. to a visit, left him stranded at the visitation center. Mother asked to use the restroom and did not return. Mother and J.C. also argued during a child family team meeting on October 5, 2020, and, the following day, mother called the police asking that J.C. be removed from her home before the line was disconnected. Mother did not pick up when the police tried to call her back, and later called the social worker and explained that she had called the police because J.C. had been aggressive with her. On October 17, 2020, police responded to a

5

domestic violence call at mother's home and arrested J.C. Mother later told the social worker she was not in danger, and she only called the police because J.C. would not leave the home.

Mother was less than compliant in her services. She completed a parenting program. She participated in individual therapy but stopped making progress and was no longer addressing stress and anxiety. She was referred to a new program, but the Agency determined she did not make substantial progress despite consistently attending for four months. Mother participated in domestic violence classes, but her insight and follow-through were still in the early stages of change.

Both mother and J.C. were visiting all four minors together. Visits transitioned from video to in person and, when the minors struggled with three-hour visits, mother offered to shorten her visits to two hours to better accommodate the minors. There were concerns, however, with mother's ability to safely manage the minors and to engage them at their level. Mother cancelled a few visits, including a visit on C.F.'s birthday because the visitation center required that masks be worn and would not allow her to bring cake for C.F. When mother complained about the staff's assessment of her parenting skills and claimed staff was flirting with J.C., the parents were referred to another visitation program. However, the referral was cancelled after mother rescheduled the intake meeting three times.

The children's placement had changed during this reporting period. The two older children, C.F. and V.F. had been placed together, but when their caregiver expressed concerns about inappropriate physical boundaries between the two children, V.F. was moved to the foster home where the two younger minors were residing. However, when V.F. exhibited high energy, stole things from around the house, and hit the caregiver's daughter with a broom, the caregiver gave notice to have the children removed. Subsequently, all four minors were placed together in a new placement in November

6

2020. The new caregiver was interested in being a concurrent home for all four minors. There were no behavioral concerns with the two youngest children.

C.F. continued to exhibit fluctuating behavioral issues at school. In November 2020, he flipped over a desk and was transitioned to distance learning, and he displayed aggressive and depressive behaviors for which he was attending individual therapy. V.F. continued to steal things around the house and hide them in her room.

The juvenile court held a contested 12-month review hearing on February 11 and February 16, 2021. The court found none of the parents had made sufficient progress or were capable of providing a safe environment for the minors, terminated reunification services, and set the matter for a section 366.26 hearing.

On April 16, 2021, the Agency requested court authorization for psychotropic medication to be administered to C.F. and V.F., both of whom had been diagnosed with attention deficit hyperactivity disorder and both of whom were having difficulty concentrating on tasks. Following a contested hearing and mother's objection, the court denied the request without prejudice.

### Section 366.36 Hearing

In its section 366.26 report filed May 28, 2021, the Agency recommended termination of parental rights with a permanent plan of adoption. The minors continued to live together in the same placement. C.F. was still exhibiting some concerning behavior, including purposely wiping H.R.'s face with a cleaning cloth, picking up a knife and "posturing at" V.F., and climbing on the bathtub and swinging off the shower rod, tearing down the shower curtain. C.F. also had tantrums during which he hit others, called them names, and destroyed property. He reported there was a demon in his bedroom and claimed the caregiver's son tried to place him in the closet or under the bed. The caregiver felt C.F. needed a higher level of care. However, C.F.'s behavior improved when, as recommended by C.F.'s therapist, the caregiver's husband spent more individualized time with him. V.F. reportedly mimicked C.F.'s behaviors and threw

7

temper tantrums when the caregiver attempted to redirect her behavior. H.R. likewise mimicked V.F.'s behaviors, including throwing things during a temper tantrum.

Despite the minors' behaviors, the potential adoptive parent was very committed to the minors and expressed a desire to adopt all four children. C.F. and V.F. preferred to be returned to their biological parents but, if that was not possible, they wanted to live with their siblings in their current foster home. The State Department of Social Services (DSS) assessed the minors as physically healthy, and while they assessed that H.R. appeared to be behind developmentally, they assessed the other minors as developmentally on track, albeit with some behavioral issues, and determined that each were likely to be adopted. The Agency recommended parental rights be terminated and the minors remain in their concurrent placement under a permanent plan of adoption.

The section 366.26 hearing commenced on August 31, 2021, and was completed on September 1, 2021. By the time of the section 366.26 hearing, mother was visiting with the children once a week for a two-hour period and visits were generally going well. Social worker Velma Green testified that her recommendation that the court terminate parental rights and order adoption as the permanent plan was based on the fact that the minors had been in their foster placement since November 2020, and they were bonded with their caregiver whom they referred to as "mom" and to whom they looked to for support and comfort. Green testified that the caregiver advocated for services for the minors and provided a stable and nurturing environment for them.

Green further testified that C.F. was receiving counseling due to his behavioral issues and was calmer during visits as a result. C.F. told her that he wanted to return to his parents, but if he could not reunify with his birth parents he wanted to remain in his current placement. Green testified that C.F.'s statements were normal for a child his age because, in her experience, "all kids have a desire to return to their birth parents." C.F. also told Green that he did not get along with his foster parent's son with whom he shared a room because the son would not play video games with him and had tried to put him in

8

a closet.  Green investigated the claim and found it to be unsubstantiated.  She noted the foster parent informed her that C.F. occasionally lied, something Green herself observed once.  Although the foster parent's son had reportedly hit C.F., Green described their relationship as a sibling relationship and noted she had no concerns for C.F.'s safety.

Green testified she believed adoption was in C.F.'s best interest because he would remain in his current placement, together with his siblings, with a foster parent who was "his primary caretaker," "very nurturing," "very committed to keeping the siblings together," and "able to advocate for his services and make[ ] sure to follow the recommendations of the service providers."  Green testified that C.F. sought comfort and direction from his foster parent and, while he had initially referred to her as his "fake mom," he had recently started calling her "mom" and stated she was "like a second mother."

Green further testified that V.F. was receiving counseling for some issues involving parentified behavior toward her younger sibling, P.C., but her behavior had improved since the inception of the case.  Green testified that V.F. told her that if she could not return home to her parents, she wanted to stay in her current foster placement.  Like C.F., Green believed adoption was in V.F.'s best interest.

As for the two youngest minors, Green testified H.R. was receiving speech therapy, physical therapy, and occupational therapy.  Green observed H.R. and P.C. to seek direction and comfort from their foster parent, although they could be somewhat "clingy."  Green testified she believed adoption was also in H.R.'s and P.C.'s best interest.

Regarding visitation, Green testified that mother saw the minors for two hours on Wednesdays and that visits were going well.  However, Green testified that terminating parental rights would not be detrimental to the minors.  She opined that the minors would be able to adjust to not having frequent contact with their parents because "they have services put in place and counseling so the foster parents will be able to utilize their

9

services if needed." Green testified that, if parental rights were terminated, contact between the minors and the parents would gradually decrease to allow the minors, the foster parent, and the birth parents time to stabilize and adjust to the change.

Che Cha, an adoption specialist with DSS, testified that she had met with the children on five occasions. Regarding C.F., Cha had conversations with him about adoption and not returning home to his mother. In an initial conversation with Cha, C.F. told her that he wanted to return home to his mother, but in a more recent conversation he told her that if he wasn't able to return to his mom, that he wanted to live with his siblings and the current caregiver. Cha admitted that C.F. had a bond with mother. When Cha told C.F. in March 2021 that he would not be returning to his parents, C.F. stated he was sad but that his wish was to always live with his siblings and never lose contact with them and to see his mother. Cha described the relationship between C.F. and the foster parent as loving. On occasion, when Cha observed C.F. acting out, the foster parent appropriately redirected him. Cha testified that V.F. also expressed her desire to return to mother and, if that was not possible, to stay with her siblings, H.R. and P.C., who Cha noted were very attached to the foster parent.

Mother testified that C.F. and V.F. each wrote letters to the court during a visit while the visitation monitor was present. The letters were admitted as exhibits at the hearing. In her letter, V.F. wrote "Dear Judge if u [*sic*] take mommy away that would hurt me." C.F. wrote "I want to come home. I don't want to loose [*sic*] my mom. I would cry forever." Mother claimed she did not prompt the minors to write the letters and only helped them with spelling. On rebuttal, the visitation monitor testified she only left the visitation room once for a brief period to sign paperwork and she never saw the minors writing letters during a visit. On further rebuttal, the social worker testified she was informed by V.F. that mother instructed her to write the letter and V.F. wrote the letter because C.F. had written one. She further testified that C.F. told her he wrote the

letter after mother informed him the judge made the decision whether he would return home to mother.

The court found the minors were adoptable, noting none of the concerns raised about the difficult relationship between C.F. and his foster brother would impede adoptability. The court rejected mother's request for a permanent plan of legal guardianship for some or all of the minors, namely due to the fact that it would place the minors "on a different legal track," which was contrary to the minors' best interests, and could potentially result in a loss of placement because the foster parent was not interested in legal guardianship.

Addressing the beneficial parental relationship exception to adoption, the court found the first prong—regular visitation and contact—was satisfied and undisputed. As for the second prong—whether the child would benefit from continuing the relationship and whether there was a compelling reason to determine that termination of parental rights would be detrimental to the child—the court found that while there was a positive relationship between mother and the minors, the foster mother and her husband were filling a parental role, while mother was not. The court found some benefit to continuing the relationship between mother and the minors, however the court further found the benefit of adoption greatly outweighed the benefit of continuing the parental relationship. The court terminated parental rights and ordered a permanent plan of adoption for all four minors.

## DISCUSSION

### I

### *Adoptability*

Mother contends there was insufficient evidence to support the court's finding that the minors were adoptable. She claims the likelihood of adoption was negatively impacted by behavioral problems exhibited by three of the four minors, C.F.'s difficulties

11

with his foster brother and his need for a "higher level of care," and the foster parent's struggle with the minors' behaviors.  The claim lacks merit.

To terminate parental rights, "the [juvenile] court must find by clear and convincing evidence that it is likely that the child will be adopted."  (*In re Asia L.* (2003) 107 Cal.App.4th 498, 509; see also § 366.26, subd. (c)(1).)  There must be "convincing evidence of the likelihood that adoption will take place within a reasonable time."  (*In re Brian P.* (2002) 99 Cal.App.4th 616, 624.)  Although a finding of adoptability must be supported by clear and convincing evidence, the determination that it is likely the child will be adopted within a reasonable time "is nevertheless a low threshold."  (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)

The issue of adoptability "focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor.  [Citations.]  Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' "  (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649, italics omitted.)  But " 'the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor.  In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family.' "  (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154, italics omitted; accord, *In re Sarah M.*, at pp. 1649-1650.)

We review the juvenile court's finding on this issue under the substantial evidence standard, giving it the benefit of every reasonable inference and resolving any evidentiary conflicts in favor of affirming.  (*In re I.I.* (2008) 168 Cal.App.4th 857, 869.)  That is, we must determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child was likely to be adopted within a

12

reasonable time. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1232.) If so, "[i]t is irrelevant that there may be evidence which would support a contrary conclusion." (*In re K.B., supra*, 173 Cal.App.4th at p. 1292.)

Here, there was sufficient evidence to support the court's finding of adoptability. Prior to November 2020, C.F. exhibited behavioral issues including hitting V.F. and throwing tantrums, and the previous caregiver reported potential inappropriate physical boundaries between the two minors. V.F. was moved to the two younger siblings' placement but, when she exhibited high energy, stole things from the caregiver's home, and hit the caregiver's daughter with a broom, the caregiver gave notice and V.F. was removed from that placement.

In November 2020, all four minors were placed together with their current caregiver. As mother points out, care of the two eldest minors in their new placement was not always smooth sailing. Despite their behavioral issues, the caregiver never wavered in her desire to provide permanency for all four minors and was committed to adopting them. She addressed the minors' behavior issues and supported and advocated for them. For example, she addressed the poor boundaries between C.F. and V.F. by placing C.F. in a room with another boy in the home and placing V.F. with the girls on a different floor. The minors were all physically healthy and, with the exception of H.R., developmentally on track. They each had a positive relationship with their caregiver, whom they called "mom" and to whom they looked for support and comfort. "A child who is happy, healthy and young, with no discernable developmental problems, can be found to be generally adoptable" whether or not a prospective adoptive family has been identified as ready to adopt. (*In re B.D.* (2019) 35 Cal.App.5th 803, 817.) Here, there was a prospective adoptive parent who was committed to keeping the minors together, advocating for them, caring for them, and addressing their negative behaviors, which improved over time.

Mother makes much of the caregiver's statement that C.F. needed "a higher level of care," arguing the caregiver's statement was "code for 'group home' " and suggested the placement was " 'close to failing.' " We note that, while mother essentially asserts there could be no other meaning for the statement, she provides no authority for that assertion. We do not engage in such speculation and, in the absence of any evidence that the placement was failing, or the caregiver intended to give notice, we conclude mother's assertion is not supported by the record.

Mother also argues the request of "the foster parent" for psychotropic medications to control the behaviors of C.F. and V.F. was an "obvious sign" that the caregiver was struggling and unable to control the minors' behaviors. As a preliminary matter, it was the minors' pediatrician who recommended the medication and the Agency who requested its use, not the caregiver. The caregiver was honest with the social worker about the challenging behaviors of the minors and open to suggestions and advice. For example, on the recommendation of a therapist, the current caregiver's husband began to spend more individualized time with C.F., resulting in an improvement in C.F.'s behavior. There was no evidence presented to suggest the caregiver was unable to manage the behaviors of C.F. and V.F.

Finally, mother asserts the most recent placement was "showing signs of unraveling," as evidenced by the fact that C.F.'s foster brother tried to push C.F. under the bed and into a closet, forced C.F.'s arms behind his back, and hit C.F. hard enough to leave a bruise. Mother also claims the foster parent "appeared to denigrate, rather than support C.F." when the foster parent claimed C.F. occasionally lied. We are not persuaded. The social worker testified to having been told by the foster parent that C.F. occasionally lied. She further testified that she had personally observed him do so on at least one occasion. In any event, as with mother's previous assertions, there was no evidence the placement was "unraveling" or that the foster parent did not support C.F. Indeed, even assuming C.F. was telling the truth, the social worker and the juvenile court

14

both characterized the relationship between C.F. and his foster brother as a normal sibling relationship that raised no concerns for the safety of C.F. or the viability of the placement.

The juvenile court's finding of adoptability was supported by substantial evidence.

## II

### *Beneficial Parental Relationship Exception to Adoption*

Mother contends the juvenile court erred by failing to find the beneficial parental relationship exception to adoption applied. The claim lacks merit.

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child. [Citation.]" (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are limited circumstances permitting the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) Such circumstances include when the parents have maintained regular visitation and contact with the child, the child would benefit from continuing the relationship, and termination of parental rights would be detrimental to the child. (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception]; *In re Caden C.* (2021) 11 Cal.5th 614, 625-626.)

To prove that the beneficial parental relationship exception applies, the parent must show there is a significant, positive emotional attachment between the parent and child. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) The parent must also prove that the parental relationship " 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re S.B.* (2008) 164 Cal.App.4th 289, 297, quoting *In re*

15

*Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, at p. 575.)

The beneficial parental relationship exception to adoption is an exception to the general rule that the court must choose adoption where possible, and it " 'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) It "must be examined on a case-by-case basis, taking into account the many variables which affect a parent[-]child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent[-]child bond." (*In re Autumn H., supra*, 27 Cal.App.4th at pp. 575-576.) The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.) The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re Caden C., supra*, 11 Cal.5th at p. 630; *In re K.P.* (2012) 203 Cal.App.4th 614, 622.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*In re Caden C.*, at p. 641.)

The specific elements of this statutory exception require a close examination of "the importance of the child's relationship with the parent or the detriment of losing that relationship." (*In re Caden C., supra*, 11 Cal.5th at p. 626.) "When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as

16

custodial caregiver relative to those of any potential adoptive parent(s)." (*Id.* at p. 634.) "[C]ourts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Ibid.*)

Here, the juvenile court found the first element of the exception—regular visitation and contact—was satisfied. That finding is undisputed on appeal. However, it is not enough for a parent to show frequent and loving contact during pleasant visits. (*In re C.F., supra*, 193 Cal.App.4th at p. 555.) In that regard, mother claims there was sufficient evidence to establish that the minors had a substantial, positive emotional attachment to her and would benefit from continuing their relationship with her, as demonstrated by the care she provided them prior to removal, the repeated requests by C.F. and V.F. to be returned to her care, the visitation notes establishing her positive interactions with the minors, and the parental role she maintained throughout the case. We are not persuaded.

While the two eldest minors spent a significant portion of their young lives in mother's care, the quality of the time in that tenuous placement is questionable given mother's significant child welfare history between 2010 and 2019, as well as the repeated incidents of domestic violence witnessed by the minors and the resulting negative behaviors exhibited by some of the minors. Once the minors were removed and placed in foster care, they began to improve and adjust to their respective placements. When C.F. and V.F. had difficulties that caused the caregivers to give notice, all four minors were placed together with their current caregiver. Some behavioral problems undoubtedly persisted with the two eldest minors, but the caregiver remained firm in her commitment to the minors, working to address those issues and giving no indication that the placement was failing, thus giving the minors security and a sense of belonging with their caregivers.

17

As to the two younger minors, H.R. was only a year old when she was removed from mother, and P.C. only two months. By the time of the section 366.26 hearing, they had spent more of their life living out of mother's care than they had living in her care. Significantly, they had spent more of their life living with each other than they had living with mother.

Mother argues she maintained her parental role throughout the proceedings by bringing things to visits, playing with the minors, and redirecting them when needed; seeking help for V.F.'s speech problems; and objecting to the medication requests. Perhaps, but there is no evidence that mother's actions in this regard continued or developed a substantial, positive emotional attachment with the children and here, the juvenile court found that it did not, noting that the relationship between mother and the minors was not a significant one.

The fact that C.F. and V.F. both preferred to return to their biological parents suggested a positive emotional attachment to mother but not necessarily a substantial one. Indeed, the minors were just as willing to stay with their current caregiver, whom they referred to as "mom," so long as all four siblings could stay together. Indeed, it was C.F.'s desire overall, to remain with his siblings. Nor were the visitation notes dispositive as to the nature and benefit of interactions between mother and the minors. While there were certainly visits that went well during which mother acted appropriately and the minors enjoyed themselves, there were also issues that presented themselves outside of the visits. For example, C.F.'s negative behaviors reportedly escalated before and after visits with mother, including tantrums and attempts to hurt his younger siblings. V.F.'s and H.R.'s behaviors also escalated prior to and after visits, and the caregiver reported having difficulty redirecting them from tantrums. P.C., the youngest of the minors, was reportedly very attached to the caregiver after visits and tended to become fussier than usual.

18

On whole, the record demonstrates substantial evidence that mother lacked a relationship with the children, the continuation of which would benefit the children. "Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. (See Goldstein et al., Beyond the Best Interests of the Child (1973) p. 17.) The relationship arises from day-to-day interaction, companionship and shared experiences. (*Id*. at p. 19.) The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.) We agree with the juvenile court, that mother's relationship with the minors was not necessarily *significant* and thus the minors would not benefit from continuing it.

Additionally, mother identified little, if any, evidence that terminating her attachment with the children would be detrimental to any of them. Quite the contrary. As discussed above, the minors were improving and becoming more settled with their potential adoptive parent, whom they called "mom" and to whom they were bonded. The foster parent provided a stable and nurturing environment for the minors and was committed to providing permanency to all four of them. When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*In re Caden C., supra*, 11 Cal.5th at pp. 633-634; *In re Autumn H., supra*, 27 Cal.App.4th at p. 575.) Here, the juvenile court did not abuse its discretion in concluding that any benefit the minors would receive in continuing their relationship with mother would not outweigh the well-being they would gain in a permanent home with their new, adoptive parent. (*In re S.B., supra*, 164 Cal.App.4th at p. 297.)

The juvenile court did not err in finding the beneficial parental relationship exception to adoption did not apply.

19

## DISPOSITION

The orders of the juvenile court are affirmed.

/s/
EARL, J.

We concur:

/s/
MAURO, Acting P. J.

/s/
DUARTE, J.